The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning, and may it please the Court. We have found no decision of any other court any time in this nation's history that prohibits the sales of non-infringing items in the United States. There is no decision of any court closing the door to non-infringing goods in response to foreign court proceedings. SAS has cited none, and there is a reason for that. The injunction the District Court issued against licensing in the United States is You put that mic closer to you. Of course. Okay. The injunction issued by the District Court prohibiting licensing of WPIL software until the judgment is paid is inconsistent with the federal rules and the All Rights Act, starting with the federal rules, and Rule 69 in particular. Rule 69 directs courts for enforcement to look to state law. There is no state law provision that says you can make life miserable for the government. Well, the District Court was driven to that injunction and driven to the steps that it dug in and refused to contribute voluntarily a penny toward the satisfaction of the North Carolina judgment, and the District Court has got to have some latitude in seeing that its The previous panel declined to issue an injunction, and the purpose of our declining to do that was to give you the opportunity to continue in your business and to collect the revenues, at least some of which I thought were going to be put to the satisfaction of the North Carolina judgment, and I feel like that we gave you that latitude and it was abused, and instead of using the revenues to satisfy even in part the North Carolina judgment, you dug in and did everything possible to avoid contributing a penny. Your Honor, first, we've offered twice now to place all U.S. collections into a lock by SAS, and SAS chose not to do it and instead chose to write our customers and demand the money, but even so, they've collected $8 million to date, which is a lot for a small company, and $2.4 million of that since September 2018 under the California assignment order alone. That's a fair amount of money, and we can actually do a question that just with an example that maybe that will help answer Judge Wilkinson's question and also explain the orders from the English court that were in the 20HA letter. So if SAS is up at the district court or the Richmond City Circuit Court and an execution of the judgment recovers a dollar from your client today, do they get to keep that dollar or do they have to give 67 cents back? So the effect of the PTIA decree, or the PTIA judgment in the English court, is that for every dollar collected in the United States, the non-compensatory portion, two-thirds, is going to be repaid, but that isn't a judgment that's enforceable in England under the terms of English law. SAS, having gone to England to sue, really cannot express surprise that it's subject to English law. And an injunction against that two-thirds, or maybe I should go back to say, and an injunction against licensing in the U.S. So is the answer they have to give the 67 cents back to your client? Pardon? Is the answer to my question they have to give the 67 cents back? They're liable in England for the non-compensatory portion, which would be two-thirds, or 67 cents, or 66 and two-thirds. But I think the answer to that is, the licensing injunction does not do anything to remediate that. The licensing injunction simply retaliates and says, you cannot operate in the U.S. until Well, let me just stick with that for a second. So is it your position that you could go into the district court up here in Richmond and assert a claim for that 67 cents? Absolutely not. And that's actually a critical point. That the English judgment, if we went to the United States and asked a court in the United States to recognize the English judgment, the United States courts would be well within their discretion to say, no, that's contrary to our rules. We're not actually going to respect that judgment. We will not recognize it. This court previously declined to recognize and respect an English judgment as a take-nothing judgment on the same claims in this case. But that doesn't mean that the court can turn around and, for example, try and foreclose the operation of English law in England. Well, you haven't even paid the compensatory portion of the judgment. Well, that was a question that the English court had to ask, which is, does the – when you apply the HCPTI, do you apply it to – assume that the payments are basically pro rata across, or is it just, you know, commensurate first? The problem is your view completely alters the nature of the earlier judgment, and it a portion of North Carolina law. I mean, I'm no great fan of the Unfair Trade Practices Act, but North Carolina, it has it – it's part of the law, and we held earlier that the UK judgment was not preclusive of the North Carolina lawsuit, that the North Carolina lawsuit could proceed. And now it seems to me we're relitigating that and saying, well, it is preclusive in certain respects, but what you're suggesting completely alters the nature of the judgment, and it seems to me it completely nullifies North Carolina law. Well, let me start with the collateral attack notion that somehow the English court is saying it's preclusive. The English court rests independently on the notion that the U.S. judgment is not enforceable in England because it's contrary to the software – the software directive, the pro-competitive and pro-expression embodiment of English law. That grounds for not enforcing the U.S. judgment isn't challenged. No one's saying that that wasn't a valid basis. No, but you're trying – you're attacking the enforceability of the judgment in the United States. No, Your Honor. The judgment remains enforceable within the boundaries of the United States, and paragraph 20 of the dissolution order that the English court issued makes it very clear that SAS remains free to, in the United States with a domestic U.S. judgment, seize, garnish, attach, attach all receivables, any assets that WPL has within the United States. The English PTA judgment simply operates in England and is – if I may just ask – only in England. What you were doing was you were taking non-UK receivables, as I understand it, and trying to park them and transform them into UK assets, which would shield them. So, Your Honor, I think the district court admitted that – No, that's right. You were repositioning assets into UK assets. No, Your Honor. The district court – These are non-UK receivables that you were going to park in the United Kingdom. No, I think the district court did not find that we moved any or parked any assets from the United States or outside the U.S. into the UK. Customers may pay money into the United Kingdom, but we have not removed any assets. And if the concern is that we are taking assets out of the United States improperly, the district court could – and found no evidence that we were – the district court could enjoin us from removing assets to the United States. The English judgment and the English injunction has nothing to do with that. If the court thought that we were changing, for example, our licensing terms, and we openly in court said we are not going to change our licensing terms, we said it in writing, and the court admitted as much. But if it still felt we might change licensing terms, the answer to that would be to prohibit us from changing our licensing terms. Let's take it outside of the United States and the United Kingdom and assume SAS is in court in Australia, and they've recovered an Australian dollar from your client. What happens to it? So in Australia, they would keep that, and the question is, would there be a corresponding debt that my client could try and collect in England, and the answer is yes, there would be a corresponding debt for 60 cents. You would not go into the Australian court and assert that they had to give you 67 Australian cents back. So we would have to ask that judgment to be recognized in Australia, and so open question whether Australian law is going to recognize the English judgment. But the fact of the matter is that the English court hasn't recognized the U.S. judgment, but in the U.S., where the U.S. judgment naturally operates, that judgment is fully enforceable. You can seize assets, receivables, and has been seizing our assets and receivables in the United States to the tune of $8 million so far, including $2.4 million under the California border. It seems to me that you're trying to prevent, you know, here you're doing business in the United States, and if you're doing business in the United States, it would seem to me that one of the prices of doing, one of the costs of doing business in the United States is that you may well be subject to a judgment of an American court. And it seems to me that an American court, working under American law, where we already held that this was, that the U.K. judgment was not preclusive of the North Carolina suit, that an American court should have the right to enforce in America a judgment that was obtained under American law, in American courts, and cannot that be enforced within the United States. And... I couldn't agree with you, Your Honor, more. Let me ask you, why were you, the whole question was, part of the enforcement proceedings were taking place within the Ninth Circuit, and all of a sudden, right in the middle of the Ninth Circuit proceedings, you were going over to the United Kingdom and obtaining an anti-suit injunction, which then were injected into the middle of the Ninth Circuit proceedings, which were going to resolve the amount of turnover that was going to be devoted to satisfaction of the North Carolina, of the North Carolina judgment. And it just seems to me that the satisfaction of this judgment, this perfectly lawful judgment, is being frustrated at every single turn. So the English judgment, the English injunction in that case, which the English court has decided it's going to resolve, it's going to dissolve. But that decision was based on a peculiar characteristic of the California enforcement mechanism. That enforcement mechanism had the effect of saying, I can order the debtor to assign assets or to transfer assets, even if those assets are, for example, in England, where the judgment isn't enforceable, even if it cuts across a prior English judgment. And this is where the English court in the dissolution judgment talks about the problems with it on paragraph 189. Even if it gets to assets that even SAS says aren't reachable. And that is what prompted the English court to issue it in the first instance, that the judgment wasn't strictly territorial in effect. It reached across to England. Now, the court has since decided to dissolve it. And it said so. And the effect on the Ninth Circuit, I think the answer for that actually is, it's up to the Ninth Circuit to decide how it's going to respond to that. It could have proceeded with briefing, which is what we said it should do. It could have remanded anyway. But it also might have been thinking that, look, this judgment, which reaches across to England, isn't proper, either as a matter of domestic law or comedy. That's all for the Ninth Circuit to decide. But it's not for the district court to turn around and say, I'm going to close the door to the United States because of an injunction in a foreign court. Rule 69. We're subject to US law, but Rule 69. Preventing the Ninth Circuit from deciding. No, the Ninth Circuit can decide. What was enjoined was arguments and litigation. And the Ninth Circuit could easily, as the district court here did, proceeded to respond to it. But it is a matter for the Ninth Circuit, not for the district court. And the Ninth Circuit may well have thought that this was not a proper relief if the judgment was rendered in the district court of North Carolina. The underlying district was. But the injunction does not do anything to affect, or release, or impact the proceedings of the Ninth Circuit. I see that I'm running out of time. And I do not want to dig into your bottle. I want to ask you a variation of the first question I asked you. If the plaintiff goes and it recovers $100 in the US, you've agreed you cannot get any of that money in the United States. We cannot. Is it your position that you're entitled to then return to England and get a judgment against SAS for $67? So the answer is, we have that judgment, which came about in a case where SAS went and sued us again in the United Kingdom. And SAS really can't express the facts. Wait, wait, wait. They've recovered $100 in the United States. Are you entitled then to go to England and levy on their assets for $67? To the extent that they are subject to English law, English jurisdiction, and their assets there, yes, English law operates in England and has that effect. But Laker Airways specifically says you tolerate that sort of thing. The US courts will tolerate it, precisely because of the consequences of what happens if you don't. And this is what's going to happen if you don't. This court case illustrates it. In the English court, remember, the first judgment in this case was from an English court that told SAS, you lose. Take nothing. You get nothing. SAS then recovered $90 million in this court. If the English court were really permissible to say, I'm going to now enforce my take nothing judgment, because I think that should control, the English court would benefit its rights to enjoin SAS from collecting any money in the United States, even on a judgment that operates only in the US. That would be a grave intrusion on comedy. But that's exactly what the North Carolina District Court did to WPL in England. We have, under English law, in a case that SAS brought, a judgment that entitles us to relief in England. I just think this is one of those cases where you have to cut through the fog. And the basic question here is that we held the North Carolina cause of action was not precluded by a judgment in England. North Carolina action went to its conclusion. And the question is whether it can be evaded at every turn in the road and in every conceivable way. And it raises for me the question of whether an American judgment obtained against a company doing business in America, in American court, under American law, can be enforced within the United States. And the answer should be within the United States. Would you think about that on rebuttal? But my answer is within the United States, the answer is yes. But within England, the answer is no. And I would like to read from SAS. But you haven't contributed a penny of any revenue in the United States towards satisfaction of the judgment. There's been no, you haven't contributed anything. A lot of money has been collected in the United States. Under the way you collect money on a judgment is under Rule 69. And Rule 69 provides the mechanisms. And using those mechanisms, SAS has collected $8 million total, $2.4 million on the California order of law. If I could reserve the remainder of my judgment, time for rebuttal. Mr. Mellon. Thank you. It may have pleased the court. Press Mellon for the plaintiff appellee, SAS Institute, Inc. I think the issue of cutting through the fog is exactly the right one here. Because the issue here, I think, does boil down to the question whether a foreign company who chooses to do business in the United States has to abide by US laws, rules, and particularly judgments against it. It's critical to sort of go back to the beginning and recognize two things, I think. First is that WPL explicitly subjected itself to US jurisdiction here. They filed a consent to jurisdiction with the trial court after initially contesting jurisdiction, saying that at this stage of our business, we don't think that we can, their words were, on a commercial basis, stay out of the United States. They fully chose to participate in the underlying case. And it's critical, I think, to note that the underlying case asserted only US claims. The damages in the underlying case were based solely on lost US customers of SAS and the lost profits flowing from that. If we're to sort of take a variation, Judge Agee, on your question of what happens when SAS goes to a state court in Virginia and obtains $100, another way to think about this would be to say, if this were not a UK company, in other words, if this were a company from any of the 49 American states other than North Carolina, what would happen in the circumstances in which a $79 million judgment was obtained against that company? Well, for starters, under the Constitution, obviously, SAS would be entitled to full faith and credit in all of the other 49 states. And they would either have to, as your Honor Judge Wilkinson said, comply and pay that judgment, or potentially subject themselves to bankruptcy court protections of the other US. My concern here is where all this is leading. And I have nothing but the greatest respect for the courts of the United Kingdom and the judges who sit there on it. It's a wonderful judiciary. The problem I have is that to allow this principle is to undermine the finality of all kinds of American judgments. It would be an affront to North Carolina law. It would be an affront to the exercise of federal jurisdiction. It would be an affront to, really, the sovereign interest in this country of being able to exert some minimal regulation over those who do business within this country. We would say they could write their own rules. And it also, it just, I guess what, well, I'm just saying the principle strikes me as problematic on so many different levels if it's allowed to go loose. I think that's right, Your Honor. And I think it illustrates itself most clearly in the Rule 69 context that was initially raised here. And in a sense, when WPL invokes Rule 69, they are the sort of functional corporate equivalent of the orphan who kills its parents and then throws itself on the mercy of the court, or the child who kills its parents and throws itself on the mercy of the court as an orphan. Because as Your Honor pointed out, what happened here is SAS followed the Rule 69 procedures in California. SAS went to court. It got an order. They didn't like the order. They appealed to the Ninth Circuit, as was their right. But then this injunction comes in and stops us dead in our tracks in California. We were directed by a UK court, directed by a UK court, on that literally when we were an hour away from filing a reply brief, we got an injunction from a court in London, December 21, 2018, don't file that reply brief. We got part of that injunction said, you must move to stay the motions pending for the indicative rulings in California. So it's one thing to say, follow Rule 69. And it's another thing to say, well, when we don't like what's happening in an enforcement proceeding in California, we're going to essentially use our status as a ward of the UK courts to get a UK court to tell SAS what it can and cannot do to collect US revenues in a US court on a US judgment based on US claims. And that just can't possibly be correct. I just think it would lead to a dissolution of international comity. I mean, if we were trying to enjoin proceedings in the middle of a UK proceeding, that distinguished judiciary in the United Kingdom would be terribly upset. And they would be rightly so. And what you would have here is one nation interfering in basically the judicial affairs of another hearing, bringing them to a complete halt in media's race. And can you imagine the impact cumulatively upon international relations if one nation is just interrupting the judicial proceedings of another nation for a judgment obtained in that other nation under that other nation's law and trying to maintain the integrity of its judicial system? I mean, it would lead to all kinds of aggravation and tension. And it just can't be that this principle should be let loose. I think that's right, Your Honor. And I think that really plays back into what the district court did here. Because the district court, I think, was very sensitive to those considerations. And so her order very much is circumscribed by the territory of the US. And it basically says two things. Until you pay that judgment, you don't get to have new customers in the US. That's all. It didn't purport to affect its business in the UK at all. If the district court didn't issue any injunction, that would have extraterritorial effect. It even allowed them to keep their existing customers in the hope that some revenue would come in, some portion of which might be used to satisfy the judgment. And if the judgment is partially satisfied, perhaps the injunction could be modified. That's entirely correct. The district court was very careful not to interfere with judicial proceedings in the UK. And wasn't it entitled to a reciprocal respect for its own judgment? I think that's right, Your Honor. And I think she did the same thing with the anti-clawback ruling. Because the anti-clawback ruling, again, applies solely to the US revenues, solely within the territory of the US. One of the things, so counsel for WPL says, well, you've collected $7 million. What's not said, though, and this is, I think, really extraordinary, and I think that this is certainly borne out in the transcript of the hearings below, what the district court found to be particularly egregious here is that when this judgment was first obtained in 2016 and appealed to this court, they basically moved to stay execution. They said, we can't post the full amount of the bond. And Judge Flanagan went through the standard inquiry and basically said, well, what can you do by way of providing security? And it was determined, ultimately, that a bond of about $2.1 million plus the establishment of an escrow flowing from US revenues would afford the security that would stop execution in the first instance while this case was on appeal here in 2017. Now, what happened is they got, and in the course of that, here's what they said about those amounts, the bond amount and the escrow amount. They said, those amounts will be retained in the US and available to SAS if WPL is not successful on the appeal. Well, what happened in England? Who held that money? That money, a bonding company posted the bond. The clerk of court in the Eastern District of North Carolina held the escrow. After this court issued its mandate, the bond amount was paid to SAS. The escrow amount was released by the clerk of court to SAS. And they got an explicit ruling in the UK that even those amounts, the amounts that allowed them to come here with a state execution in 2017, are subject to the clawback. And that's just not right. And that, but that's what they did. Well, have they proceeded in England to, in effect, obtain a judgment or a levy on a judgment for the 2 3rds non-compensatory amounts that you have recovered? They have obtained a judgment for those 2 3rds amounts. The amounts and those amounts related to essentially four different categories, the bond, the escrow, an amount here that was in connection with these proceedings in 2019 that they paid over $1.1 million that they had not paid according to the California assignment order and repatriated to England, and the sort of dribs and drabs amounts that SAS has been able to collect from customers pursuant to the California assignment order. All of those amounts, up to a certain point in time, and I believe it's about the middle of last year, have been reduced to a judgment in the UK representing 2 3rds of those amounts collected solely in the US, as to which there is a final judgment of the UK court. The UK court determined that SAS would not be entitled to appeal. And then the appellate court agreed that SAS would not be entitled to appeal. They come after you in England to try to obtain those funds? Not yet, Your Honor. And the reason is because of the anti-clawback injunction issued in this case. So the only thing that is stopping SAS from having to pay those amounts is the anti-clawback injunction that says to them, look, with amounts collected on a US judgment in the US, you don't get to claw those back. Now, there's a certain asymmetry in what the courts can and can't do because of the nature of the parties here. SAS, which is a larger company, has significant operations in the UK. And this is in the record, many employees, bank accounts, operations in the UK. And so when a UK court, for example, issues an injunction as they did with a penal notice that says to SAS, your officers and employees can be in contempt if there is violation here, that has real teeth. The same is not true, though, with WPL in the US. Because WPL has no operations, has no assets here, it essentially ships in its software electronically, doesn't come in on a container, in an envelope. There's nothing to seize. And so there's a real asymmetry in terms of what a court can and can't do vis-a-vis these parties in the different jurisdictions. And so Judge Flanagan was very much backed into a corner in terms of the types of injunctive relief that would be available to her in the context of a party like this. What other options did Judge Flanagan have other than the anti-clawback order and the injunction? I don't think she had any other options, Your Honor, any other options that would have any teeth. Well, that's just what I'm saying. She availed herself of really the only things that were available to her. And if she hadn't taken those two steps, which were measured and territorially carefully circumscribed, but if she hadn't taken those two limited steps, it would have made all of these judgments simply advisory or without effect. It would have just said, well, there's this judgment, but it doesn't mean anything. I mean, if even this is too much, it makes judgments meaningless. I think that's exactly right, Your Honor. And there's even a further sort of issue. Not only was what was available to her such a small piece, but Sass, remember, was prohibited from seeking a whole host of potential relief by virtue of the UK injunction. And so, for example, when she ordered the anti-clawback ruling, that was explicitly relief that Sass was not allowed to ask for. And in a review of the transcript, you will see that I had to stand mute with respect to the anti-clawback ruling. And in fact, the only reason I'm even able to argue in favor of the anti-clawback ruling here today is that the sufferance of these people who said that they would not report me to the UK court for being in contempt of arguing to your honors in favor of the anti-clawback ruling. So we have an extraordinary intrusion into US litigation, US process, US justice. And this is where we are in a measured order as Judge Flanagan entered here, which limits itself to US customers, US receivables within the territorial United States, is really, I think, about the minimal and maximal limit of what a court could conceivably do to make this judgment more than just a piece of paper. And the injunction expires upon satisfaction of the judgment. Exactly. It's within the may well, if they want new customers and they want to expand their American business, they have a way of getting rid of the injunction. It was term limited. It doesn't go on forever. It expires upon satisfaction of the judgment. I don't even know that the judgment needs to be entirely satisfied, because they can seek modification of the injunction if good faith efforts are made to comply. I think that's exactly right, that they would have precisely the same opportunities that SAS had to go back to the district court if there are changed circumstances. I'd like to note two things. So all I'm saying is it gives them a measure of control. Absolutely. They're totally in control in that regard, totally in control. I'd like to mention two things before my time is up. I want to make sure I got to these. One relates to something that we really haven't heard about, which is the standard of review here. And I just want to make it clear that the standard of review, both with respect to Rule 60b-6 and with respect to the All Writs Act, is abuse of discretion. I think that the court, the district court in this case, has obviously superintended this case for going on 10 years now, is quite familiar with all of the ins and outs. The rulings of this court have been two so far. I guess we're getting ready for a third. The district court conducted two lengthy multi-hour hearings, took evidence at different times in January, February, and March, written evidence from World Programming. And I think it would be very difficult, and I don't think World Programming really even tries very much, to try to indicate that there is anything that could properly be characterized as an abuse of discretion with respect to these rulings. The second thing I want to make sure that we're clear on are the circumstances that have happened since this order was issued on March 18. Now, it would be SAS's position that under an abuse of discretion standard, the way to look at the district court's order would be to look at it at the point in time that it was issued. But there have been additional developments, particularly in the UK. And those developments, and brought to the court's attention under Rule 28J, things have gotten worse for SAS in the UK since March 18. On May 22nd, and then in the second ruling on August 22nd, the UK court issued its final judgments, confirming that, number one, the US judgment was entirely unenforceable. Not the punitive part, not the troubled part, not the compensatory part. It indicated a final ruling that its clawback ruling, including the clawback ruling that related to the bond and security established so they could come to Richmond the first time, that would stand. And it would apply to all US collections from dollar one. On December 9th, the Court of Appeals, I mentioned, affirmed the lower court ruling that SAS would not be able to appeal that. On September 25th, the UK court issued an order indicating that its injunction had been improvidently granted. But two days after that, the same court said, we are going to let you, World Programming, appeal that. And while it's being appealed, we're going to keep the injunction in place. That order also told SAS, ordered them to pay just under $5 million to the US as part of a clawback, including the security that was established. Well, that is interesting to know, but I don't think it's our intention to jump into the UK judicial proceedings or to straighten out whatever disagreements exist between SAS and the UK courts with respect to business conducted in the UK. All we're doing and all we're faced with here is this anti-clawback order and the injunctive relief and the enforceability of a United States judgment within the United States. And I don't want to put us in the posture of interfering with the judicial proceedings or commenting or interfering with the judicial proceedings of the United Kingdom, but it's just a matter of protecting the integrity of our own law and our own judgments and not having those be ruled meaningless as a matter of international law and particularly in the face of the prior ruling of this court, which was that the North Carolina action was not precluded. I think that's exactly correct, Your Honor, and that's why the only relief that we're seeking here is an affirmance of the March 18th order. Thank you, Your Honors. Mr. Lamkin. I'd like to begin with a clarification, and that is that Mr. Millen's arguments regarding the PTIA decree are not at the sufferance of these people, as he puts it. The English court carefully trying to avoid interference with this court's proceedings issued an order. This is page 3, paragraph 6, that says, for avoidance of doubt, this shall not prevent Sass and the current proceedings before the Fourth Circuit from freely briefing and arguing before that court all issues pertinent to the appeal. That was the English court's ruling. It's not our ruling. But just I would like to begin, Judge Wilkinson, where you asked me to, what you asked me to think about, which is are we subject to US law? And the answer, obviously, is yes. Is a judgment issued in the United States enforceable in the United States? The answer to that question is absolutely yes. But the question is, what does US law provide on that? And I think I haven't heard yet anything that suggests that under Rule 69, it's a viable, permissible, or authorized enforcement mechanism to say, you may not do business in the United States until the judgment's paid. There is simply no provision that says pay the judgment or get out under Rule 69 or state law. And those are the exact words that Mr. Millen used. They're not saying get out? Well, it's pay the judgment or don't send anything more in, I guess, would be a better way of putting it. But if, Judge Wilkinson, I think the reason for that is it actually leads to a double recovery. Remember, SAS has a judgment that covers future damages. But they're asking for an injunction to prevent us from making sales that would prevent those future damages from ever accruing. You can't reconcile those two things, which is why that sort of injunction isn't permissible. Fourth, I'd like to talk about the California issue and the scope of the order that the English court issued, saying that you couldn't go and get this turnover relief or relief that had the effect of assigning assets. And the reason for that was precisely the reasons, Judge Wilkinson, you're describing, is that the English court was concerned. Now, it has since dissolved it on comedy grounds or since it's ruled that it will dissolve it. But the reason it did was that unique California procedure, which doesn't prevent you, which is different from just seizing things in the United States, would have allowed SAS to reach into England and force English company to satisfy a judgment in England and take conduct in England that cut across an English judgment. And it uses that phrase. Nobody's reaching into England. So the assignment order and the turnover order would have the effect of requiring WPL to do things in England to satisfy the judgment and potentially to transfer assets that were subject to the English judgment that said that the US judgment is enforceable there. And that's why you had that injunction. It leaves in place all the traditional, every single traditional mechanism for collection in the US. I mean, that's your choice as to how you utilize those particular assets. They're not. There's nothing in the district court's order that says you've got to take UK assets and satisfy the American judgment. That was the problem with the California order and one of the reasons why. The California order is both an appeal and why the English court enjoined it. But they didn't enjoin, and it didn't in any way enjoin, the traditional collection mechanisms, just like seizing all the US jails. The district court orders speak purely to the enforcement of the American judgment. They don't say how you can satisfy the judgment. They don't pretend to dictate to you how to satisfy the judgment. It just says that the judgment needs to be satisfied. But it's your option as to how it's satisfied. You don't have to use UK assets to satisfy it. You may want to if you make a business decision that it's more profitable for you to get the judgment satisfied and get the injunction removed and go and collect all kinds of new customers. This district judge did not want to put you out of business. Neither does this court. Everyone bent over backwards not to do that. And that's why we didn't authorize an injunction in the earlier appeal. So I think we don't want to put you out of business. And I think one of the difficulties is this sort of injunction inevitably will make it harder for us to pay that judgment and may bring about that very result. But I think, Judge Wilkinson, I should be very clear. The concern the English court had when it issued the injunction with respect to the California order was not that there were collections going on in the United States, in the collection of the United States assets. Those were left in place. The only thing it was concerned about, and the only thing, and one of the reasons it's going to dissolve it anyway, but the only thing it was concerned about was the reaching across into England that the assignment order and the turnover could have in cutting across an English judgment. It was an order designed to protect the English judgment. And the assets were subject to that English judgment. I don't think it's a legitimate basis to say we're going to ban you from the US because an English judgment tried to protect its own, an English court protected its own judgment. Finally, I want to talk to one really briefly about the PTI injunction that he's described. If our worry is about not reaching across into foreign legal systems to enjoin collection of their judgments within their own boundaries, that is precisely what the PTI injunction does. It says you have an English judgment in England under a set of English policies enforceable in England. They're not going to try and enforce it in the US. And you may not collect that English judgment. And if that's because it's contrary to our prior judgment, if that's permissible, that opens up, as Laker Airways points out, World War III on injunctions. Because then it's permissible for the English court to look at this court and say, your judgment for $89 million? That's contrary to my prior judgment, which was take nothing. And I will enjoin SAS from collecting that judgment. The one thing that cannot be done, the one thing that Laker Airways makes clear is if you're talking about territorial sovereignty, you don't enjoin a money judgment in a foreign court where that money judgment has effect and does not itself reach across into another court. Thank you, sir. Thank you so much. Appreciate it. Thank you. We would like to come down Greek Council. And then we will proceed to our next case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Stephanie D. Thacker